UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI
GULFPORT DIVISION

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| Alliance Consulting Group, LLC, | § | Case No. 13-51937-KMS |
| | § | |
| Debtor. | § | |

## DRYING FACILITY ASSETS HOLDING, LLC'S OBJECTION TO THE MOTION TO REOPEN CHAPTER 11 BANKRUPTCY CASE FILED BY PLANT MATERIALS, LLC

Drying Facilities Assets Holding, LLC ("**DFAH**") files this objection (the "**Objection**") to the Motion to Reopen Chapter 11 Bankruptcy Case (the "**Motion**") filed by filed by Plant Materials, LLC ("**PM**"). In support hereof, DFAH states as follows:

### BACKGROUND

A.   **The Bankruptcy and the Free and Clear Sale**

1.   On October 3, 2013, creditors of Alliance Consulting Group, LLC ("**ACG**" or the "**Debtor**") filed a *Chapter 11 Involuntary Petition for Relief* [Doc. 1] against ACG. This Court entered an *Order for Relief* [Doc. 55] on October 25, 2013, and entered an *Order Granting U.S. Trustee's Application for Approval of Chapter 11 Trustee, Richard W. Cryar* [Doc. 139] appointing the Chapter 11 Trustee (the "**Trustee**") on December 5, 2013. On January 23, 2014, the U.S. Trustee filed a *Notice of Appointment of Creditors' Committee* [Doc. 217], appointing an unsecured creditors committee (the "**Committee**") in the Debtor's bankruptcy case.

2.   On August 17, 2014, Stonehill Institutional Partners, L.P. ("**Stonehill**") and Elle Investments, LLC ("**Elle**", and together with Stonehill, the "**Lenders**") filed the *Lenders' Second Amended Plan of Reorganization for Alliance Consulting Group, LLC* [Doc. 812] (together with all amendments, modifications, and supplements thereto, the "**Plan**"). The Plan was a culmination of nearly a year of intense litigation and negotiation between the Lenders, the

Trustee, the Committee and Ryan Hess. Confirmation of the Plan was overwhelmingly supported by creditors and equity in the case.

3.      The centerpiece of the Plan was a global settlement between the Lenders and the estate. Under the Plan, the Lenders agreed to the marketing and potential sale of the Debtor's "frac" sand processing facility (the "**Drying Facility**") and Mine Assets Holding, LLC's wet mine (the "**Mine**")[1] by guaranteeing sufficient funding levels to ensure distributions were made to administrative and unsecured creditors. After an extensive marketing process, no bids were received for the Mine and the Lenders were the highest bid for the Drying Facility.

4.      On August 22, 2014 the Court entered its *Findings of Fact, Conclusions of Law, and Order Pursuant To 11 U.S.C. § 1129 and Fed. R. Bankr. P. 3020 Confirming the Lenders' Second Amended Plan Of Reorganization For Alliance Consulting Group* [Doc. 862] (the "**Confirmation Order**") confirming the Plan. Under the Confirmation Order, the sale of the Drying Facility to the Lenders (the "**Sale Transaction**") was approved by the Court under 11 U.S.C. § 363(b) and 1123(b), and the Trustee was authorized to transfer the Drying Facility and related assets free and clear of all claims, liens, and interests. On October 6, 2014 (the "**Effective Date**"), the *Notice of Effective Date of the Second Amended Plan of Reorganization for Alliance Consulting Group, LLC* [Doc. 937] was filed by the Lenders.

5.      On the Effective Date, DFAH (as the Lenders' designee) and the Trustee entered into and closed that certain Drying Facility Purchase Agreement and DFAH took title to the Drying Facility and related assets.[2] As consideration for the acquisition of assets under the

_____

[1] In the Motion, PM incorrectly alleges that the Mine was owned by ACG. In actuality, the Mine was never owned by ACG.

[2] True and correct copies of the Drying Facility Purchase Agreement and the Bill of Sale are attached hereto as **Exhibits A and B**.

*HOU 408684665v5*                    2

Drying Facility Purchase Agreement, the Lenders credit bid over **$16 million** in secured claims

DFAH assumed the following liabilities:

> On the terms and subject to the conditions of this Agreement, Purchaser will, at the Closing, assume and thereafter in due course pay, perform and discharge (i) all liabilities for ***unpaid personal property taxes on*** or with respect to the Personal Property and real property taxes payable by lessee under the Lease, without credit against the Purchase Price, and (ii) all liabilities and obligations ***occurring on or arising out of or in connection with the operation of the Drying Facility on the Leased Premises from and after the Closing Date*** (the "Assumed Liabilities").

Drying Facility Purchase Agreement, ¶C (emphasis added).

6.     In support of the global settlement reached in the case and in reliance on the terms

of the Plan and the Confirmation Order, the Lenders: (i) credit bid over **$16.3 million** of their

secured claims for the Drying Facility and related assets; (ii) provided **$2.25 million** in exit

financing to pay allowed claims, including administrative claims; and (iii) agreed to the payment

of approximately **$1.6 million** to unsecured creditors in preference to the Lenders' $13.9 million

deficiency claim. Further, Elle, Mine Assets Holding, LLC and Shale Support Services, LLC

("**S3**") voluntarily subordinated over $8 million in additional unsecured claims against the estate

to the payment of other unsecured creditors pursuant to the global settlement. While the Lenders

complied in every respect with the Plan, and notwithstanding the Trustee's post-confirmation

collection efforts, there were no funds available to repay the obligations under the exit facility.

The Lenders, Michel Moreno, and Mine Assets Holding, LLC have received no payments under

the Plan. In fact, none of the parties which PM alleges are insiders received any plan payments

aside from S3 – which received a $138,000 administrative claim payment.

7.     On September 13, 2016, this Court, upon finding that the estate was fully

administered, entered and *Order Closing Case* [Doc. 1187] discharging the Trustee and closing

the Debtor's case.

**B.     Post-Confirmation Transactions**

8.      After the Effective Date, S3 was released from its position as operator of the Drying Facility and Shale Support Holdings, LLC ("**SSH**") became the operator of record of the Drying Facility.[3]

9.      In addition, after taking ownership of the Drying Facility, and in reliance on the finality of the Sale Transaction and Confirmation Order, DFAH sought and received $60 million in secured financing to expand operations from an unaffiliated third-party. This financing was secured by first priority liens on DFAH's assets – including the Drying Facility.

**C.     The Installation of the "Second Screen" and PM's Claims**

10.     On July 20, 2017, PM filed its *Motion to Reopen Chapter 11 Case* [Doc. 1204] arguing, *inter alia*, that the complex settlement and transactions accomplished under the Plan and Confirmation Order should avoided in order to satisfy PM's alleged claims against a non-debtor.

11.     PM's alleged claims arise from the postpetition operation of the Drying Facility by S3. As the Court will recall, after the appointment of the Trustee, S3 and the Trustee entered into an agreement (the "**Operating Agreement**") in which the Trustee permitted S3, *inter alia*, to operate the Drying Facility and make certain operational improvements to the Drying Facility.[4] In exchange, S3 agreed to pay the Trustee a per-ton fee for "frac" sand produced at the Drying Facility. With respect to the proposed improvements, the Operating Agreement provides, in pertinent part, as follows:

> • Trustee acknowledges that **S3 owns that certain model 3801-3 Rotex mineral separator painted blue with white legs, serial no. S056882/0 (the "Second Screen")**…. Operating Agreement, § 3A. (emphasis added).

---

[3] A True and correct copy of the 12/11/14 "Mine Operator Identification" from the Mine Safety and Health Administration website showing Shale Support Holdings, LLC as operator of the Drying Facility is attached hereto as **Exhibit C**.

[4] A true and correct copy of the Operating Agreement is attached hereto as **Exhibit D**.

- "Trustee authorizes S3 … to **install the second screen at the Dry Plant**, and to make the proposed changes and **modifications as set forth on the Plant Materials, LLC Sales Order no. SSSO 14PMO1S dated May 1, 2014**." *Id.* (emphasis added).

- S3 is responsible for the proper workmanlike installation and modifications for all work S3 does at the Dry Plant. *Id.* at § 3B.

- For the weeks S3 operates the Dry Plant in connection with the actual production of Sand (which began in March of 2013), **S3 will not seek an administrative claim for its operational expenditures** including the pro rata costs of liability & property insurance, the Leasco Lease, mobile services lease, natural gas consumption, electric consumption and Minolta Lease. S3 reserves the right to seek an administrative expense with respect to operational costs for any time periods (**other than the about three week period to perform the installation of the second Screen and the work contemplated to be performed by Plant Materials, LLC**) in which it is not producing sand. *Id.*

12.     As explained by the Trustee and Mr. Bowen at a hearing on June 4, 2014, the operational improvements referenced in the Operating Agreement were intended to integrate the Second Screen (which was owned by S3) into the Drying Facility processing operations by connecting new belts, conveyors, and other needed apparatus (each of which were separately purchased by S3) into the existing manufacturing processes at the Drying Facility.[5]

13.     The integration of S3's property into the existing operations of the Drying Facility was to be completed by PM pursuant to the proposal submitted by PM referenced in the Operating Agreement as the Plant Materials, LLC Sales Order no. SSSO 14PMO1S dated May 1, 2014 (the "**PM Contract**").[6] In the transmittal email providing the PM Contract, the representative of PM represented that the integration of S3's property into the Dry Facility would

---

[5] *See* June 4, 2014 Hearing Transcript, pgs. 106-107; (testimony of Kevin Bowen describing S3's payments for the screen); 140 lns. 23-25 (testimony of the Trustee stating "[the Operating Agreement] is an agreement that we struck for S3 and the lenders to make some improvements and changes in the plant, specifically to install another screen.); *Id.* at pg. 143 lns 13-24 (explaining that the Trustee's rationale for concluding that finding the second screen was owned by S3); pg. 152, lns.7-22 (same). A True and correct copy of the June 4, 2014 Hearing Transcript is attached hereto as **Exhibit E**.

[6] A copy of the PM Contract is attached hereto as **Exhibit F**.

be complete in **21 days**.[7]  To accomplish this 3 week turnaround, PM agreed to provide 24 hour labor over the 3 week period at approximately $160,000 per week or a total cost of approximately $480,000.  At all relevant times during this process, S3 informed PM that: (i) **ACG was in bankruptcy**; and (ii) Trustee approval of the PM Contract was needed before PM could begin work.

14.     PM started work on the integration of S3's screen into the Drying Facility manufacturing process on June 9, 2014.  After 13 weeks of billing by PM, it became apparent that PM was not capable of integrating S3's property into the existing Drying Facility infrastructure.  Due to the fact that the delay was impacting production at the Drying Facility, on September 7, 2014, S3 terminated PM and brought in a replacement contractor.

15.     PM's delay resulted in lost sales for over 49,000 tons of "frac" sand.  These sales would have netted the estate approximately $131,000 under the Operating Agreement.  Moreover, PM's failure to accomplish the work (despite being paid twice the quoted price), required S3 to expend an additional $38,000 to mitigate its damages.  Ultimately, S3 completed the installation of its Second Screen on October 10, 2014.  Through the course of PM's work on the project, S3 paid PM $863,395.66.  Thereafter, PM asserted that it was owed over **$700,000** in additional fees and costs.  On July 1, 2017, PM made written demand on S3 for payment of an additional $604,000 and filed its Motion approximately three weeks later.

---

[7] *See* Email from Alec Woodson (PM's representative) to Jeff Bartlam (S3's representative) dated May 1, 2014, attached hereto as **Exhibit G**.

## OBJECTION

### A.  PM's Motion should be Denied Because PM has no Standing to Assert a Claim Against the Estate.

16.     The Motion should be denied because PM lacks standing to seek to reopen the case. Only parties able to demonstrate the requisite standing may seek to reopen a bankruptcy case. *See Nintendo Co., Ltd. v. Patten (In re Alpex Computer Corp.)*, 71 F.3d 353, 356 (10th Cir. 1995) (denying motion to reopen because movant lacked standing in the underlying bankruptcy case). As explained by the Tenth Circuit, there are four parties that have standing to reopen a bankruptcy case: the debtor, the trustee, a creditor or a party in interest. *Id.*; *see also* FED. R. BANKR. P. 5010 ("A case may be reopened on motion of the debtor or other party in interest pursuant to a § 350(b) of the Code). PM is none of these.

#### (i)     PM is not a Creditor.

17.     In the Motion, PM a describes itself as a creditor of ACG and a party in interest and therefore entitled to notice of the Bankruptcy Case and an opportunity to make a claim against the estate. *See* Motion, at 1. This is incorrect. As the Trustee and Mr. Bowen testified and the PM Contract shows, PM contracted with *S3* to integrate *S3's equipment* into the existing Drying Facility production apparatus. Any alleged claims by PM solely relate to work done under the PM Contract with S3 and were for service's rendered with respect to S3's property. Therefore, PM's claims are solely against S3 and *not* the estate.

18.     In addition, in an attempt to manufacture a substantial contribution claim against the estate, PM asserts that its work somehow increased the value of the Drying Facility. *See* Motion, at 7. Again, this is incorrect and DFAH disagrees. As explained above, PM's work *delayed production* at the facility and cost S3 the opportunity to produce and sell additional "frac" sand. Under the Operating Agreement, the estate would have been entitled to a per-ton

fee for each ton of this additional sand that would have been processed but for PM's inability to complete its contractual duties. As such, instead of benefiting the estate, this failure by PM actually damaged the estate by restricting production capabilities for 13 weeks.

19.     Regardless, PM's work involved the installation of S3's personal property consisting of various materials to integrate S3's machinery into the processes of the Drying Facility. This fact was expressly recognized in the Boyd appraisal of the Drying Facility in the "As Improved" scenario. *See* Boyd Appraisal, pg. 2. Fn.2.[8] Specifically, while Boyd stated that the addition of the Second Screen (as defined in the Operating Agreement)—in addition to a host of other improvements and an assumed doubling of the sales at the facility—was an assumption for the Drying Facility to be value at $16.3 million, the report further qualifies that "BOYD has been informed that if the Lenders do not acquire the ownership of the Dying Facility **the second screen will be removed by SSS**." Boyd Report, pg. 2, fn 2 (emphasis added). Since the work being done by PM would be removed by S3 upon the purchase by a third party, it is disingenuous to claim that this work increased any parties' bid thereby benefitting the Debtor's estate.[9] Indeed, after closing the Drying Facility Asset Purchase Agreement, DFAH acquired the Second Screen and related personal property from S3. As such, the property PM was allegedly improving was all owned by S3 – not the estate. Moreover, S3, not the estate, was the sole party that could have received the benefit of such work. Consequently, PM is not a creditor of the estate.

---

[8] A True and correct copy of the Boyd Appraisal is attached hereto as **Exhibit H.**

[9] Because the Lenders had already agreed to subordinate their deficiency claim prior to submitting their bid, the Lenders had no incentive to maximize their deficiency claim against ACG by bidding the lowest possible amount. The next highest bid submitted was a $400,000 bid for the Debtor's equipment. *See* August 18, 2014 Confirmation Hearing Transcript, pg. 67, lns 20-22 (proffer By Mr. Steffes of testimony by Mr. Wiada); pg 69, lns. 9-14 (affirmation of Mr. Waida of proffer). A copy of the August 18, 2014 Confirmation Hearing Transcript is attached hereto as **Exhibit I**.

### (ii)     PM is not a Party in Interest.

20.     The term party in interest is read coextensively with Article III standing. *See In re Global Indus. Technologies, Inc.* 645 F.3d 201, 211 (3d Cir. 2011). Article III standing has three elements: (i) the plaintiff must have sustained an "injury in fact," that is "concrete," "distinct and palpable", and "actual or imminent"[10]; (ii) the injury must be traceable to the defendant's action, (i.e., there must be a causal connection between the two); and (iii) a ruling in favor of the plaintiff will likely redress the injury.[11] For PM to establish its "party-in-interest" status, it must demonstrate sufficient injury caused *by the Debtor*. In this case, any alleged injury to PM was visited on PM by S3 – not ACG. Therefore, PM lacks standing to move the court to re-open the bankruptcy and the Motion should be denied.

### B.     PM's Motion should be Denied Because this Court Lacks Subject Matter Jurisdiction and an Adequate, Non-Bankruptcy Remedy for the Redress of PM's Purported Claims Exists.

21.     A proceeding solely between non-debtor parties based on non-bankruptcy law, such as the one here, can only be heard by bankruptcy courts under "related to" jurisdiction.[12] While bankruptcy courts are authorized to hear three categories of civil proceedings ancillary to underlying bankruptcy cases – those "arising under title 11," those "arising in ... a case under title 11," and those that are "related to a case under title 11" – both "arising under" and "arising in" proceedings, by their very nature, involve either the debtor or its estate.[13] *Stern v. Marshall*, 564 U.S. 462, 473 (2011); 28 U.S.C. § 1334(b); 28 U.S.C. § 157(a).

---

[10] *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

[11] *19 Court Street Assocs., LLC v. Resolution Trust Corp. (In re 19 Court Street Assocs., LLC)*, 190 B.R. 983, 991 (Bailiff. S.D.N.Y. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, (1992)).

[12] The "related to" connection has been described as "the minimum for bankruptcy jurisdiction." E. Scott Fruehwald, *The Related to Subject Matter Jurisdiction of Bankruptcy Courts*, 44 Drake L.Rev. 1, 7 (1995).

[13] Proceedings "arising under title 11" involve "a cause of action created by a statutory provision therein," and proceedings "arising in . . . a case under title 11" are those "which by their nature can only arise in bankruptcy cases." *In re Wilborn*, 609 F.3d 748, 752 (5th Cir. 2010).

22.     Proceedings which are "related to a case under title 11" are those that "could *conceivably* have any effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (emphasis original). To conceivably have any effect on the estate, a matter must "alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . impact[] upon the handling and administration of the bankrupt estate." *Pacor*, 743 F.2d at 994; *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995) ("Proceedings 'related to' the bankruptcy include . . . suits between third parties which have an effect on the bankruptcy estate."). The relief sought in PM's Motion does not invoke any of these jurisdictional predicates for the simple fact that there is no connection with ACG or its estate.

23.     As shown above, the root of this matter is a two party dispute between non-Debtor S3 and non-Debtor PM involving state contract law following the closing of a fully administered bankruptcy estate. As such, it does not meet the bar to be considered related to the bankruptcy for lack of impact on the estate or its administration, which has been completed. The fact is that "jurisdiction over nonbankruptcy controversies with third parties who are otherwise strangers to . . . the parent bankruptcy does not exist." *Id.* (citing *In re Haug*, 19 B.R. 223, 224–25 (Bankr D. Ore. 1982)). PM has no claim against ACG or its estate, nor would any outcome of this matter have any impact on ACG or its estate. No matter how hard it tries, PM cannot connect this proceeding to the substantive rights of ACG, and because ACG's estate has been fully administered, there is simply no basis for jurisdiction in the present matter. Therefore, PM should avail itself of a court with jurisdiction over such matters as opposed to seeking redress in the Bankruptcy Court which has no jurisdiction over such non-debtor v. non-debtor claims.

24. The proper forum for PM's dispute with S3 is a court with jurisdiction to enforce the payments allegedly due to it under the PM Contract. *See, e.g., In re Apex Oil Company,* 406 F.3d 538 (8th Cir. 2005) (affirming the bankruptcy court's order denying motion to reopen Chapter 11 bankruptcy case due to availability of relief in an alternative forum); *In re Xofox Industries, Ltd.,* 241 B.R. 541, 543-44 (Bankr. E.D. Mich. 1999) (stating that creditors may proceed in state court without relief from the Bankruptcy Court post-confirmation, but cannot bring actions to collect individual obligations to the Bankruptcy Court); *see also In re Raskin,* 78 B.R. 343 (Bankr. S.D. Fla. 1987) (holding where the relief sought by reopening the bankruptcy case is equally available under state law, there is no compelling justification to reopen the bankruptcy case for affording the same relief).

25. The bankruptcy court is not the proper forum for the adjudication of a contractual dispute between the S3 and PM, and in fact lacks the jurisdiction to do so. Hearing this matter is unconstitutional, will cause undue hardship for numerous parties in interest, including DFAH, in the monitoring of any subsequent bankruptcy proceedings. If PM seeks a judicial determination regarding its contractual fee dispute with S3, it can pursue its remedies in state court.

## C. PM's Motion should be Denied Because DFAH Relied on the Finality of the Confirmation Order in Funding the Refinancing Transaction.

26. Before closing the transactions under the Plan, including advancing over \$2 million under the Exit Facility, the Lenders and their designee, DFAH, relied on the finality[14] of

---

[14] The Bankruptcy Code promotes finality over other concerns. For example, Section 1127 only allows modification if the plan has not been substantially consummated, and, as discussed below, section 1144 allows revocation of plan confirmation orders obtained through fraud only during the first six months following confirmation. Such policy has been looked to by courts in declaring appeals of confirmation orders moot. *See In re Continental Airlines,* 91 F.3d 553, 560 (3d Cir. 1996) (". . . the public policy of affording finality to bankruptcy judgments . . ."). While not an appeal, this Motion is a collateral attack on a confirmation order that has been justifiably relied on for almost 3 years. The Fifth Circuit has recognized that, "there is a point beyond which a court cannot order fundamental changes in reorganization actions." *Wells Fargo Bank N.A. v. Texas Grand Prairie Hotel Realty, L.L.C. (In re Texas Grand Prairie Hotel Realty), L.L.C.,* 710 F.3d 324, 327 (5th Cir. 2013) (citing *In re Scopac (Scopac I),* 624 F.3d 274, 281 (5th Cir. 2010)). That point has clearly been reached in this case.

the provided provisions of the Confirmation Order—including, without limitation, the provision regarding the vesting of the property of the estate, free and clear of all liens and encumbrances, in DFAH. Since the effective date, DFAH has incurred an additional debt of $60 million— secured by first priority liens—from an unaffiliated third party to finance the expansion of the Drying Facility and other corporate matters. These actions were taken largely due to the certainty afforded under the Confirmation Order.

27.     If the Motion is granted, DFAH is at risk of suffering harm due to its current efforts to finance its operations either through secured debt or equity. If this bankruptcy case is reopened, DFAH's financings could be delayed as no lender and/or equity partner will likely fund DFAH with the prospect of an unidentified avoidance action being filed that would disrupt rights in collateral. If DFAH is unable to finance its operations, it would itself be subject to foreclosure and other remedies by its lenders potentially jeopardizing the numerous Mississippi jobs provided at the Drying Facility and the Mine. As such, reopening this bankruptcy case would not only interfere with DFAH's rights under the Plan and Confirmation Order, but it could cause DFAH to suffer additional expense due to the potential impact on its financing activities.

## D.    PM's Motion should be Denied Because PM is Unable to Meet its Burden under Section 350(b) to Reopen the Bankruptcy.

28.     Section 350(b) of the Bankruptcy Code provides that a bankruptcy case "may be reopened in the court in which such case was closed to administer assets, accord relief to the debtor, or for **other cause**." *See* 11 U.S.C. § 350(a) (emphasis added); FED. R. BANKR. P. 5010; Norton on Bankruptcy, § 34:3. "Reopening of a case is within the sound discretion of the court, and a case will only be reopened upon the demonstration of **compelling circumstances** justifying the reopening." *In re Goetz*, 2009 Bankr. LEXIS 5521 at **5-6 (S.D. Tex Bankr.

2009) (emphasis added); *Sexton v. IRS*, 2014 BR, 2014 Bankr. LEXIS 3103 at \*6 (W.D. Va. Bankr. July 21, 2014) (quoting *In re Mutts*, 131 B.R. 306, 307 (Bankr. E.D. Va. 1991)); *In re Bearden*, 204 B.R. 73, 74 (N.D. Fla. Bankr. 1996) (citing *In re Palij*, 202 Bankr. 27, 30 (Bankr. D. N.J. 1996), *In re Rediker*, 25 Bankr. 71, 73 (Bankr. M.D. Tenn. 1982)). "The longer the time between the closing of the estate and the motion to reopen, however, the more compelling the reason for reopening the estate should be." *Citizens Bank & Trust Co. v. Case (In re Case)*, 937 F.2d 1014, 1018 (5th Cir. 1991) (citing *Reid v. Richardson*, 304 F.2d 351, 355 (4th Cir. 1962). The burden of proof to demonstrate circumstances that are sufficiently compelling to justify reopening a case is on the movant. *See Goetz*, at \*6 (citing *In re Winburn*, 196 B.R. 894, 897 (Bankr. N.D.Fla. 1996), *In re Nelson*, 100 B.R. 905, 906 (Bankr. N.D. Ohio 1989)).

29.     If substantive relief cannot be granted in the reopened case, then there is no reason to grant a motion to reopen. Further, if reopening a case would be futile and a waste of judicial resources or would serve no purpose, then cause to reopen does not exist. *Goetz*, at \*6 (citing *In re Carberry*, 186 B.R. 401 (Bankr. E.D.Va. 1995), *In re Kinion*, 207 F.3d 751 (5th Cir. 2000); *In re Canal Street Limited Partnership*, 260 B.R. 460 (Bankr. D. Minn. 2001), *aff'd* 269 B.R. 375, 461-62 (8th Cir. B.A.P. 2001) (holding "[w]here the stated purpose of reopening is the proposed commencement of judicial proceedings, the applicant must show that the proceedings have merit. Where the sought-for relief is not available, there is no cause for reopening.") (citing *Arleaux v. Arleaux*, 210 B.R. 148, 150 (8th Cir. B.A.P. 1997)); *In re Jenkins*, 330 B.R. 625, 628 (Bankr. E.D. Tenn. 2005) (holding case will not be reopened "if doing so would be futile.") *Zirnhelt v. Madaj (In re Madaj)*, 149 F.3d 467, 472 (6th Cir. 1998) (case will not be reopened where the reopening will have no effect); *In re Hardy*, 209 B.R. 371, 373 (Bankr. E.D. Va. 1997) (in deciding a motion to reopen, the court "must determine if the underlying cause of action . . .

is likely to be sustained when considered on the merits."). As such, "when the movant cannot ultimately obtain the substantive relief which he seeks, there is no reason to grant [a] motion [to reopen]." *In re Murphy*, 547 B.R. 875, 879 (W.D. Pa. Bank 2016) (citing *In re Janocha*, No. 06-20191JAD, 2015 WL 128152, at *2 (Bankr.W.D.Pa. Jan. 8, 2015)). Here, PM's prayer outlines **seven** specific judicial proceedings it seeks to initiate upon the reopening of the case. As demonstrated below, each of these proceedings, however, is objectively futile and/or wholly unavailable to PM.

### (i) PM's Request to Challenge the Confirmation Order Provisions on the Sale regarding the Sale of the Drying Facility are Barred by Section 1144 and Otherwise Defective.

30.    In its prayer, PM seeks to have the case reopened to (a) "file a motion to *avoid the sale* of the Drying Facility to DFAH"; (b) to "seek a determination that "the sale of the Drying Facility was *not 'free and clear'* of PM's claims due to the lack of notice and due process provided to PM;" and (c) to "seek to disgorge any Plan payments that may have been made on any insider claims to the extent necessary to satisfy PM's claim(s)".[15] *See* Motion, at 13 ¶(b), (e) and (h) (emphasis added). These requests directly challenge the terms of the Plan and Confirmation Order which provided, *inter alia*, for the sale of the Drying Facility to DFAH free and clear of claims. Section 1144 of the Bankruptcy Code provides that, "[o]n request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, **the court may revoke such order if and only if such order was procured by fraud ….**" 11 U.S.C. § 1144 (emphasis added). While on its face, section 1144 appears to apply only to efforts to revoke a confirmation order, courts have adopted a wider approach, and have applied the bar in section 1144 when the complaint in question appears "to

---

[15] S3 is the only alleged insider of ACG that received plan payments. PM may properly file suit against S3 without reopening ACG's bankruptcy.

do indirectly what [the plaintiffs] no longer may do directly" because of that statutory bar. *Hotel Corp. of the South v. Rampart 920, Inc.*, 46 B.R. 758, 770-71 (E.D. La. 1985), *aff'd*, 781 F.2d 901 (5th Cir.1986); *In re Emmer Bros. Co.*, 52 B.R. 385, 391 (D.Minn.1985) ("creditors may not attack confirmation orders by simply characterizing the attempt as an independent cause of action rather than a motion to revoke the order").

31.    Here, the transfer of the Drying Facility free and clear of claims was one of the central components of the Plan and any request to avoid the Court-approved transfer through some unidentified avoidance theory is a direct attack on the Confirmation Order. Pursuant to Section 1144 and Rule 7001(5), a complaint requesting revocation of confirmation order must be filed within 180 days from the date of confirmation of the debtor's plan of reorganization. The 180-day deadline in ACG's case was in February 2015, approximately *2 1/2 years* prior to the filing of PM's Motion.[16]  In short, PM's failed to timely commence a complaint to revoke confirmation of the Plan under section 1144. That deadline cannot be extended past the February, 2015 deadline. PM's requests to avoid the sale and challenge the Confirmation Order's free and clear findings are therefore is futile.[17]

32.    In addition, PM raises no legal theory to justify avoidance of the Court approved transfer to DFAH or the Court's express findings of the free and clear nature of the transfer. PM

---

[16] The deadline for filing a complaint to revoke confirmation cannot be extended. Under Bankruptcy Rule 9024, which incorporates the Rule 60(b) of the Federal Rules of Civil Procedure, the power to amend a federal court order, specifically provides that Rule 60(b) does not apply to "a complaint to revoke an order confirming a plan . . .", which "may be filed only within the time allowed by [the 180-day deadline under] § 1144 . . ." Finally, Bankruptcy Rule 9006(b)(2) incorporates the foregoing structure by specifically providing that the Bankruptcy Court cannot "enlarge the time for taking action under Rules . . . 9024." Fed. Rule Bankr. P. 9006(b)(2).

[17] As explained in *In re Genesis Health Ventures Inc.*, 340 BR 729 (D. Del. 2006), the 180 day time limit is strictly construed, and is enforced even when the alleged fraud is discovered outside the deadline. *Id.* at 733 (citing *In re Midstate Mortgage Investors, Inc.*, 105 Fed.Appx. 420, 423 (3d Cir.2004) ("Expiration of the limitations period bars a motion to set aside the confirmation of a reorganization plan even if the fraud is not discovered until the period has passed.") (quoting *In re Orange Tree Assocs., Ltd.*, 961 F.2d 1445, 1447 (9th Cir.1992)).

is unambiguously *not* a creditor of ACG and therefore not entitled to any relief regarding the sale of the Drying Facility Assets under the Plan and Confirmation Order from this Court.

33.    Finally, if PM asserts that it did do work on the actual Drying Facility and that it wanted its claim to attach to the Drying Facility, its remedy was to file a lien under applicable Mississippi law. *See* Mississippi's Construction Lien Law, Miss. Code Ann. § 85-7-401 *et. seq*. Notably, despite the fact that PM asserts that it has not been paid for over three years, it has never asserted any lien rights against the Drying Facility. Accordingly, PM's requests to challenge the transfer of the Drying Facility and this Court's findings on the same are futile and should not serve as a basis for reopening the case.

### (ii)    PM's Proposed Declaratory Judgment Action is Futile for Lack of Bankruptcy Court Jurisdiction and under applicable Law.

34.    In addition to its untimely attack on this Court's Confirmation Order, PM also seeks to reopen this case to obtain a declaratory judgment from this Court that:

>    (i)    "SRY, the Lenders, and/or some other party(ies) agreed to assume the costs and expenses of operating the Drying Facility, including the work performed by PM;" and
>
>    (ii)    "DFAH, Spectrum, and/or the Lenders assumed liabilities to PM under the terms of the Drying Facility Purchase Agreement."

*See* Motion, at 13, ¶ (b) and (d).

35.    PM's requests for declaratory judgment are objectively futile because PM has no basis for this Court to assert jurisdiction against the non-lender parties. *See, e.g., In re Digital Impact*, Inc., 223 B.R. 1, 11 (Bankr. N.D. Okla. 1998) (holding that controversies are not "cases under" title 11 where parties thereto are not debtors in bankruptcy, and that controversies did not "arise under" Code, because "controversies contemplated [between the parties] are not limited to

causes of action under the Bankruptcy Code, such as avoidance actions").[18]  Moreover, the PM Motion is devoid of any basis to assert the Lenders, SRY, DFAH, Spectrum, or other parties assumed **any** obligation to PM.  Under the PM Contract (which is governed by Texas law),[19] this requested relief is futile because PM identifies no agreement of assumption in which these parties assumed S3's alleged liability to PM.  Pursuant to the Section 26.01 of the Texas Business and Commerce Code, "[a] promise by one person to answer for the debt, default, or miscarriage of another person … is not enforceable unless the promise or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him."  *See* TEX. BUS. COMM. CODE, § 26.01(a) and (b)(2).

36.    The only writing signed by any party with respect to the assumption of debts cited by PM is the Drying Facility Purchase Agreement. Under this agreement, however, DFAH only agreed to assume the Assumed Liabilities, consisting of (a) certain unpaid taxes; and (b) liabilities and obligations occurring on or arising out of or in connection with the operation of the Drying Facility on the Leased Premises from and after (October 6, 2014) (i.e., the closing of the Drying Facility Purchase Agreement). *See* Drying Facility Purchase Agreement, § C. As admitted by PM, PM's claims did not arise on or after the October 6, 2014 closing date. *See* PM Motion, ¶ 37 ("PM ultimately completed the work at the Drying Facility by September 7, 2014.").

37.    Indeed, the sole basis for the alleged assumption provided in the PM Motion is the allegation that SSH and S3 are somehow alter egos:

---

[18] See *supra*, Section B.

[19] *See* PM Contract § 28(k) ("For Services, Equipment Parts or Rental provided, or to be provided, by Contractor in the America's [*sic*], this Agreement shall be governed by and interpreted in accordance with the substantive laws of the State of Texas, excluding conflicts and choice of law principles.").

During the Bankruptcy Case, S3 consistently represented to this Court that S3 had been the MSHA-designated operator of the Drying Facility since approximately January 2013.38 But the MSHA's records now reflect that the registered operator of the Drying Facility is SSH, with a "begin date" of *February 2, 2013*.

In other words, the MSHA's records appear to indicate that SSH began operating the Drying Facility nearly two years before SSH existed, at approximately the same time that S3 represented to this Court that S3 began operating the Drying Facility. This suggests that SSH actually assumed operation of the Drying Facility some time after SSH was formed on October 10, 2014, but continued to operate using S3's MSHA Operator Number and merely changed the Operator name in the MSHA's records, which—if true—suggests that SSH is merely an alter ego of S3 and other possible Moreno entities.

PM Motion, ¶¶ 43-44.

38.     As set forth above, SSH submitted its application to become the MSHA-designated operator on December 11, 2014. *See* SSH Application dated 12/11/14. While SSH does not control the MSHA database referenced above, a MSHA's mistake is insufficient to assert that S3 and SSH are alter egos of one another. As such, even PM's sole basis for potential liability is fatally flawed.

### (iii)    PM's Surcharge Request Fails as a Matter of Law for Lack of Standing.

39.     The relief requested in subparagraph (g) of PM's prayer seeks authority to "file a motion to surcharge PM's fees, costs, and expenses under, inter alia, 11 U.S.C. § 506(c)." This requested relief is defective, as a matter of law, because only the Trustee has standing to assert surcharge claims in bankruptcy. *See Hartford Underwriters Insurance Company v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). Moreover, pursuant to section 8.2 of Plan and paragraph 24 the Confirmation Order, the Lenders were specifically released from such claims.

### (iv)    PM's Requests to a Proof of Claim and an Administrative Claim is Futile because the Estate has no Assets to Administer.

40.     Finally, PM's requested relief in subparagraphs (a) and (f) of PM's prayer seek to allow PM to: "file a proof of claim [and a] motion for allowance of "substantial contribution"

administrative-expense claim(s) under, inter alia, 11 U.S.C. § 503(b)(3)(D), (4)." PM Motion, pg. 13. As explained above[20], PM has asserted no basis for asserting a claim against ACG. Its contract was with S3 and its work was done on behalf of and for the purported benefit of S3's property. Further, due to PM's inability to complete the work, PM prevented the estate from realizing the benefits of any improvements S3 sought to obtain under the PM Agreement.

41. Regardless, even if a claim were permissible, the estate has no assets to distribute on such claims. The Plan has been fully consummated and the Bankruptcy Court can no longer fashion an appropriate remedy even if revocation of confirmation were appropriate. *In re Circle K Corp.*, 171 B.R. 666 (Bankr. D. Ariz. 1994); *see, e.g., In re Servico*, Inc., 161 B.R. 297, (S.D. Fla. 1993). As such, any attempt by PM to assert a claim against ACG is also futile.

[*rest of page left intentionally blank*]

---

[20] *See supra*, Section A.

WHEREFORE, DFAH respectfully requests that the Court enter an Order denying the

Motions and for such and further relief as is just and appropriate.

Dated: August 14, 2017
10/10/17

Robert Alan Byrd (MBN 7651)
Byrd & Wiser
145 Main Street
P.O. Box 1939
Biloxi, Mississippi 39533
Telephone: 228.432.8123
Facsimile: 228.432.7029
Email: rab@byrdwiser.com

- and -

Karl Burrer (admitted *pro hac vice*)
Greenberg Traurig, LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: 713.374.3612
Facsimile: 713.583.9502
Email: burrerk@gtlaw.com

*Attorneys for Drying Facility Asset
Holdings, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**GULFPORT DIVISION**

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **Alliance Consulting Group, LLC,** | § | **Case No. 13-51937-KMS** |
| | § | |
| **Debtor.** | § | |

**CERTIFICATE OF SERVICE**

I, Robert Alan Byrd, counsel for Drying Facility Assets Holding, LLC, hereby certify that, on October 6, 2014, I caused a true and correct copy of the forgoing pleading, to be served via the Court's CM/ECF Notification System on each party receiving notices thereunder.

Dated: August 14, 2017

10/10/17

Robert Alan Byrd (MBN 7651)
Byrd & Wiser
145 Main Street
P.O. Box 1939
Biloxi, Mississippi 39533
Telephone: 228.432.8123
Facsimile: 228.432.7029
Email: rab@byrdwiser.com